WENONA HARRY,

          Plaintiff,

  v.                                          Case No. 22-cv-0186-bhl

KILOLO KIJAKAZI,[1] Acting Commissioner
of Social Security Administration,

          Defendant.

---

## DECISION AND ORDER

---

Plaintiff Wenona Harry seeks the reversal and remand of the Acting Commissioner of Social Security's decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Acting Commissioner's decision will be affirmed.

### PROCEDURAL BACKGROUND

Harry applied for DIB and SSI on January 9, 2020. (ECF No. 12 at 2.) Her claims were denied initially and on reconsideration, so she sought a hearing before an administrative law judge (ALJ). (ECF No. 22 at 2.) That hearing occurred on July 6, 2021. (ECF No. 9-3 at 39.) In a decision dated September 1, 2021, the ALJ found Harry "not disabled." (*Id.* at 34.) The Appeals Council denied her request for review, and this action followed. (ECF No. 22 at 2.)

### FACTUAL BACKGROUND

Harry has a long history of poorly controlled hypertension. (ECF No. 12 at 3.) Over the years, her systolic pressure often surpassed 200 in the afternoons. (ECF No. 9-8 at 348.) For reference, a normal systolic reading is less than 120. *Understanding Blood Pressure Readings*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last visited Dec. 12, 2022). Harry also suffers from a Haglund's

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for former Commissioner Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

deformity, or "enlargement of the bony section" of her heel. (ECF No. 12 at 4 n.2.) At the time of her hearing before the ALJ, she testified that she lived with her aunt and struggled to do much of anything on a daily basis. (ECF No. 9-3 at 51-53.) Based on her testimony and the record evidence, the ALJ found that Harry had the following severe impairments: "Achilles tendinitis with moderate Haglund's deformity; obesity; obstructive sleep apnea (OSA); history of congestive heart failure (CHF); essential hypertension (HTN); cardiomyopathy; depressive disorder; and anxiety disorder." (*Id.* at 19-20.)

## LEGAL STANDARD

The Acting Commissioner's final decision on the denial of benefits will be upheld "if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. §405(g)). Substantial evidence is not conclusive evidence; it is merely "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). The Supreme Court has instructed that "the threshold for such evidentiary sufficiency is not high." *Id.* In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citation omitted).

In reviewing the entire record, this Court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

## ANALYSIS

Harry identifies three alleged errors necessitating remand: (1) the ALJ violated Social Security Ruling (SSR) 16-3p when he improperly discounted her subjective symptoms; (2) the ALJ's residual functional capacity (RFC) analysis failed to account for certain limitations supported by the record; and (3) the ALJ's determination that there exist a significant number of

jobs in the national economy that Harry can perform does not rest on substantial evidence. Because none of her arguments carries the day, the Acting Commissioner's decision will be affirmed.

## I. The ALJ Provided Valid Reasons for Discounting Harry's Subjective Symptom Allegations.

When determining the existence or extent of a disability, SSR 16-3p requires ALJs to consider a claimant's "own description or statement of . . . her physical or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). This is a two-step process. First, the ALJ considers "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." *Id.* at *3. If there is such an impairment, then the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* Because an ALJ "is in the best position" to make this credibility determination, reviewing courts will reverse it only if "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

In Harry's case, the ALJ found that her underlying impairments could be expected to produce her alleged symptoms, but rejected Harry's statements concerning the intensity, persistence, and limiting effects of those symptoms as not entirely consistent with the evidence in the record. (ECF No. 9-3 at 25.) The ALJ gave five reasons to support his adverse credibility determination: (1) Harry refused to quit smoking; (2) Harry's treatment provider recommended against surgery for her Haglund's deformity; (3) Harry did not have a prescription for a walker or wheelchair and made no mention of needing either in her function report; (4) Harry's hypertension was under control with medication, which she routinely refused to take; and (5) Harry was able to perform some daily activities. (*Id.* at 28-29.) The first three are not part of an acceptable rationale, but the last two together constitute substantial evidence.

Not all of these rationales hold water. Starting from the top, it is well-established that smoking is highly addictive, and it is not easy to quit. Accordingly, as the Seventh Circuit has recognized, "even if medical evidence [establishes] a link between smoking and [a claimant's] symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that [her] condition is serious or painful." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). Indeed, "[o]ne does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the

product impacts their ability to stop." *Id.* In short, addiction does not make one a liar. Harry's nicotine dependence does not in any way undermine her integrity, so it "is an unreliable basis on which to rest a credibility determination." *Id.*

Next, it is true but misleading to suggest that Harry's treatment provider recommended against surgery for her Haglund's deformity. Dr. James Knavel did in fact tell Harry to explore "nonsurgical treatment." (ECF No. 9-8 at 351.) But context matters. Dr. Knavel's treatment notes elaborate: "The healing time is prolonged, particularly in heavier people and the potential for wound problems is great. She would be in a cast and non weight bearing for several weeks. One has to wonder if she would have the cardiac reserve to do that." (*Id.*) Read in full, Dr. Knavel counselled against surgery not because Harry's injury was minor but because surgery could realistically result in cardiac problems, perhaps even death. This undercuts the ALJ's suggestion that Harry's "conservative" treatment belied the extent of her alleged pain.

The ALJ also mischaracterized the record when he wrote that Harry "made no mention" of needing a walker or wheelchair in her function report. (ECF No. 9-3 at 29.) Indeed, Harry specifically checked that she did use a wheelchair. (ECF No. 9-7 at 34.) And she further explained that she meant that she rode motorized carts in stores because she could not walk very far. (*Id.*) The ALJ apparently found it damning that she lacked a prescription for these motorized carts. (ECF No. 9-3 at 29.) But a person does not need a prescription to obtain and use a motorized cart, so the absence of one cannot support an adverse credibility determination. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription.").

The other bases for the ALJ's credibility determinations have merit, however. The ALJ was justified in citing Harry's medication noncompliance. When a claimant "fails to follow prescribed treatment that might improve symptoms, [an ALJ] may find the alleged intensity and persistence of [the claimant's] symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9. But the ALJ may not make this finding without first considering reasons for noncompliance. *Id.*

The record shows that Harry often unilaterally stopped taking her hypertension medications. Dr. Timothy Tobin noted as far back as March 15, 2017 that Harry suffered from "hypertension for many years not under good control in part due to noncompliance with most of

her medications." (ECF No. 9-8 at 100.) On July 29, 2019, Harry went to the emergency room with a blood pressure of 229 over 112. (ECF No. 9-9 at 96.) The next day, Dr. Kenneth Bortin wrote that Harry had "been off her medications for the past 2 years" "[b]ecause of side effects and financial reasons." (*Id.* at 89.) Because her blood pressure improved significantly with medication, Dr. Bortin started "her on a medical regimen that she [could] afford." (*Id.* at 90.) A week later, Harry saw Dr. Gary Myron and informed him that she had "stopped taking prescribed medications 3 days ago as she was not feeling well." (ECF No. 9-8 at 343.) Dr. Myron's treatment notes state that Harry initially "refuse[d] to take all three [of her hypertension] medications," but "[a]fter a lengthy discussion she agree[d] to continue with Metoprolol and Amlodipine." (*Id.* at 344.) Harry followed up with Dr. Myron on September 3, 2019. (*Id.* at 346.) At this appointment, Dr. Myron described Harry's blood pressure as "still high but . . . improving." (*Id.*) On November 25, 2019, Harry visited Dr. Bortin, who measured her blood pressure at 144 over 90. (ECF No. 9-9 at 176.) Her blood pressure went as low as 135 over 83 during a December 3, 2019 appointment with Dr. Myron. (ECF No. 9-8 at 349.) Although the hypertension medications appeared to be having their intended effect, Harry stopped taking them because, in her own words, "they didn't make a difference." (ECF No. 9-9 at 59.) She issued this proclamation on October 16, 2020, while seeking emergency medical treatment for shortness of breath. (*Id.*) At that time, her blood pressure read 184 over 105. (*Id.* at 60.) After hospital staff gave Harry her home doses of her medications, she saw "significant improvement in her blood pressure." (*Id.* at 65.) In a disability report issued on December 11, 2020, Dr. Kurt Reintjes described Harry as "non-compliant with her medications." (*Id.* at 73.)

Harry does not dispute her long history of noncompliance. Instead, she faults the ALJ for failing to explore *why* she was noncompliant. An ALJ is not permitted to draw inferences from a claimant's medical noncompliance unless he first investigates possible explanations for that noncompliance. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). The Seventh Circuit has reversed and remanded in cases where, for example, an ALJ cited noncompliance in his credibility determination but did not mention that doctors eventually instructed the claimant to stop taking the medication at issue because it caused diarrhea and hair loss. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). It is similarly problematic for an ALJ to ignore the prohibitive cost of certain treatments. *See id.* But neither circumstance exists here. To the contrary, Harry's doctors did everything they could to encourage her to *continue* taking her medication, and they even put

her on a regimen she could afford. She contends that she simply could not tolerate the medications' side effects, but medical providers never confirmed the existence of these alleged side effects. The Seventh Circuit has upheld an ALJ's credibility determination when the only evidence of side effects was the claimant's own testimony, unsupported by any medical records. *See Rasmussen v. Astrue*, 254 F. App'x 542, 547 (7th Cir. 2007). At this point in the process, Harry had the burden to prove her disability, and that included proving the existence of supposed side effects. She did not do so. As a result, her noncompliance is a legitimate foundation on which to rest an adverse credibility determination.

Furthermore, while ALJs should not over-rely on a claimant's abilities to perform daily activities, *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006), those activities are a factor that an ALJ must consider when making a credibility determination. SSR 16-3p, 2017 WL 5180304, at *7. The evidence in this case revealed that Harry had no trouble moving around during a face-to-face disability field office interview and was also able to cook, do some household chores, drive, shop, and go to doctors' appointments. (ECF No. 9-3 at 29.) The ALJ reasonably concluded that her capacity to perform those activities undermined the extent of her allegations. This, too, supports the adverse credibility determination.

Separately, Harry also challenges the ALJ's failure to consider her obesity in conjunction with other severe impairments. The ALJ did, however, state that "the exacerbatory impact of [Harry's] obese state [was] considered in assessing" her RFC. (*Id.* at 25.) To the extent this alone was insufficient, the ALJ indirectly accounted for Harry's obesity when he assessed an RFC consistent with the prior administrative medical findings of the state agency consultants. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that a diagnosis is "factored indirectly into [an] ALJ's decision" when the ALJ adopts a physician's opinion and that opinion considers the diagnosis); *Hoyt v. Colvin*, 553 F. App'x 625, 628 (7th Cir. 2014) ("[T]he ALJ indirectly accounted for [the claimant's] obesity by relying on the medical opinions of state-agency physicians who evaluated [the claimant's] height and weight.").

In this case, "the ALJ's credibility determination was not flawless," but "it was far from 'patently wrong.'" *Simila*, 573 F.3d at 517. Accordingly, this Court will not disturb it.

## II. The ALJ's RFC Properly Accounted for All Limitations Supported by the Medical Evidence of Record.

A claimant's residual functional capacity or RFC is "an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995,

1000-01 (7th Cir. 2004). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). And "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996). In other words, the ALJ must build a "logical bridge" between the evidence of record and the RFC assessed. *See Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008).

In this case, the ALJ found, in relevant part, that Harry had the RFC to perform sedentary work:

> except that [she] is further limited to standing and/or walking for a total of two hours per eight-hour workday; occasionally balancing, crouching, crawling, kneeling, stooping, or climbing ramps or stairs; [and] never climbing ladders, ropes or scaffolds.

(ECF No. 9-3 at 24.) Harry argues that this RFC omitted potentially work preclusive limitations supported by the record. As it pertains to these physical limitations, the ALJ considered the prior administrative medical findings of Drs. William Fowler and Marcia Lipski as well as the medical opinion of Dr. Reintjes. (*Id.* at 31-32.) He dubbed the prior administrative medical findings "substantially persuasive" and Dr. Reintjes' opinion "partially persuasive." (*Id.* at 31.) The ALJ also considered Harry's own subjective symptoms, though, as previously explained, reasonably discounted her more extreme allegations. (*Id.* at 28-29.) None of this was improper.

The ALJ's RFC included all of Drs. Fowler's and Lipski's limitations (it actually went beyond what Dr. Lipski opined). (ECF No. 22 at 12-13.) It also appears to have accommodated Dr. Reintjes' opinion, though that is not entirely clear because that opinion lacked specific quantifiable functional limitations. (ECF No. 9-9 at 73-74 ("[Harry] will continue to have difficulty with ambulation, standing for long periods, going up and down steps or any exertional type of activity.").) The ALJ noted that the opinion's vagueness decreased its persuasive value. (ECF No. 9-3 at 31-32.) But he nevertheless restricted Harry to no more than two hours of standing and walking per day and no more than occasionally climbing steps, broadly consistent with Dr. Reintjes' opinion. (*Id.* at 24.) Thus, the ALJ did not merely dismiss Dr. Reintjes' opinion as Harry claims. Rather, he reasonably accounted for it in his RFC analysis, crafting limitations supported by substantial evidence in the record and prior administrative medical findings. *See Hughes v. Kijakazi*, 21-cv-367-slc, 2022 WL 4103194, at *6 (W.D. Wis. Sept. 8, 2022).

The ALJ fashioned a reasonable RFC based on the medical evidence in the record and Harry's own testimony. Though she may disagree with the outcome, Harry cannot identify any properly supported limitation excluded from the RFC analysis.

### III. The ALJ Properly Found a Significant Number of Jobs in the National Economy that Harry Could Work Despite Her Limitations.

When a claimant's severe impairments do not presumptively establish a disability but nevertheless preclude the claimant from performing past relevant work, an ALJ turns to a vocational expert (VE) to determine whether there exists in the national economy a significant number of jobs that the claimant can perform. 20 C.F.R. §404.1512. The VE is not required to perform a literal headcount of jobs in existence; she must only advance a reasonable approximation. *See Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). At that point, "the ALJ is granted discretion to determine what constitutes a 'significant' number of jobs." *Milhem v. Kijakazi*, 52 F.4th 688, 694 (7th Cir. 2022). But that determination must rest on "substantial evidence." *Id.* at 696.

In this case, Harry argues that there is no substantial evidence to support the ALJ's conclusion that there exists in the national economy a significant number of jobs that she can work. The Acting Commissioner responds that Harry waived her right to raise this challenge because she did not question the VE about it at the hearing. "But because the significance determination was made only after the hearing had concluded, [Harry] did not waive her . . . argument that [29,800][2] jobs is not a 'significant' number of jobs for purposes of the step-five determination." *Id.* at 694. In other words, because the regulations entrust the "significance determination" to the ALJ, and that determination is only made after a hearing, the failure to challenge the determination at the hearing cannot constitute waiver because, at that point, there is nothing to challenge.

Ultimately, though, Harry's argument cannot prevail. In *Milhem*, the Seventh Circuit found that an ALJ's step-five determination was based on substantial evidence because she "grounded her conclusion that the number of jobs mentioned was 'significant' on her consideration of [the claimant's] age, education, work experience, and [RFC] and that [the claimant] was capable of making a successful adjustment to work that exists in the economy." 52 F.4th at 696 (internal

---

[2] The exact number of jobs at issue is unclear because of a discrepancy between the ALJ's decision and the hearing transcript. The ALJ wrote that the VE estimated 23,000 tube operator jobs in the national economy, but the hearing transcript puts the number at 3,000. (ECF No. 22 at 14 n.5.) For sake of argument, the Court will adopt the lower number, which brings the total for all jobs the VE identified to 29,800.

quotations omitted).  The ALJ in Harry's case made the exact same finding.  (ECF No. 9-3 at 33.)  The *Milhem* Court also placed importance on the ALJ's hypotheticals, which "revealed that she weighed testimony presented and determined that [the claimant] could at least perform sedentary work."  *Milhem,* 52 F.4th at 696.  And she "further assessed the tolerance for absences in these positions, the requirements for being on task in the workplace, and the frequency of breaks during the workday," all of which reflected "[her] conclusions about [the claimant's] capacity to perform work."  *Id.*  Harry's ALJ behaved identically.  (ECF No. 9-3 at 59-63.)  The only distinction between *Milhem* and the instant case is the number of jobs at issue—89,000 versus 29,800.  *Milhem*, 52 F.4th at 696.  But the logic of *Milhem* suggests that an ALJ may consider even a number of jobs as low as 29,800 "significant" if he engages in a robust, careful analysis.  In fact, the *Milhem* Court cited approvingly to decisions from other circuits in which 32,000, 25,000, and 10,000 national jobs were held to be "significant."  *Id.* at 697 (citing *Moats v. Comm'r of Soc. Sec.* 42 F.4th 558, 563 (6th Cir. 2022) (32,000 jobs); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 jobs)).  The ALJ in Harry's case performed commensurate with the ALJ whose determination the Seventh Circuit upheld in *Milhem*.  And the number of jobs he found "significant" does not fall below any sort of per se threshold.  The Court, therefore, finds that substantial evidence supports his conclusion that 29,800 jobs in the national economy constitutes a significant number.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. §405(g), the decision of the Acting Commissioner of the Social Security Administration is **AFFIRMED**, and the case is **dismissed**.  The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on December 12, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge